*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0298p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

No. 06-1475
INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE, AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA; EARL L. HENRY, et al.,
                    *Plaintiffs-Appellees,*

LEROY HENRY MCKNIGHT, et al.,
                    *Movants-Appellants,*

            *v.*

GENERAL MOTORS CORPORATION,
                    *Defendant-Appellee.*

No. 06-2064
INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE, AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA; BOBBY HARDWICK, et al.,
                    *Plaintiffs-Appellees,*

LAWRENCE BRONSON, et al.,
                    *Consolidated Plaintiffs-Appellants,*

            v.

FORD MOTOR COMPANY,
                    *Defendant-Appellee.*

Nos. 06-1475/2064

Appeals from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-73991—Robert H. Cleland, District Judge.
No. 05-74730—Paul D. Borman, District Judge.

Argued: June 7, 2007

Decided and Filed: August 7, 2007

1

Before:  MARTIN and SUTTON, Circuit Judges; GRAHAM, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:**  Mark S. Baumkel, PROVIZER & PHILLIPS, Bingham Farms, Michigan, James R. Malone, Jr.,  CHIMICLES & TIKELLIS, Haverford, Pennsylvania, for Appellants.  Julia Penny Clark, BREDHOFF & KAISER, Washington, D.C., William T. Payne, Pittsburgh, Pennsylvania, Richard C. Godfrey, KIRKLAND & ELLIS, Chicago, Illinois, Jonathan L. Abram, HOGAN & HARTSON, Washington, D.C., for Appellees.  **ON BRIEF:**  Mark S. Baumkel, PROVIZER & PHILLIPS, Bingham Farms, Michigan, James R. Malone, Jr.,  Daniel B. Scott, CHIMICLES & TIKELLIS,  Haverford,  Pennsylvania,  for  Appellants.   Julia  Penny  Clark,  John  M.  West, BREDHOFF & KAISER, Washington, D.C., John E. Stember, Edward J. Feinstein, STEMBER, FEINSTEIN, DOYLE & PAYNE, Pittsburgh, Pennsylvania, William T. Payne, Pittsburgh, Pennsylvania, Richard C. Godfrey, John F. Hagan, Jr., Andrew B. Bloomer, Catherine L. Fitzpatrick, KIRKLAND & ELLIS, Chicago, Illinois, Jonathan L. Abram, HOGAN & HARTSON, Washington, D.C., for Appellees.

_____

**OPINION**

_____

        SUTTON, Circuit Judge.  The fortunes of the General Motors Corporation and the Ford Motor Company, two of the world's largest auto makers and two of this country's largest employers, have risen and fallen many times over the last 50 years.  Their most recent economic challenges stem from a variety of factors, including the emergence of vigorous international competition, the ever-changing preferences of the American consumer and the fiscal strain of maintaining healthcare benefits for retirees well in excess of those provided by their foreign competitors.

        In 2005, GM and Ford tried to address one of these issues by reducing retiree healthcare benefits, only to be challenged by the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the UAW), which represents hourly workers at both companies and which negotiated these healthcare benefits in the first place.  Insisting that the retirees' healthcare benefits had vested and could not be modified without the retirees' consent, the UAW filed this declaratory-judgment action and eventually proposed a class of retirees from GM and Ford to defend its position.  Through two similar agreements, the companies, the UAW and the classes proposed to settle their differences.  A small percentage of retirees from each company (less than one half of one percent) objected to the proposed settlements and, when the district courts rejected their objections after a fairness hearing, appealed to our court.  We have consolidated the appeals and now affirm.

I.

        *Retiree Healthcare Benefits Provided by the Two Companies*.  For more than 50 years, the UAW has been negotiating with GM and Ford over retiree healthcare benefits for hourly retirees. Starting in 1955, GM gave retirees what now sounds like a quaint option:  They could purchase hospital and medical coverage, but GM would not subsidize the cost of this coverage. Ford followed suit three years later.  In 1961, GM and Ford agreed to pay half the healthcare premiums for retirees

_____

[*] The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

and to extend these benefits to hourly workers who had retired under previous collective bargaining agreements. At the same time, GM offered coverage to retiree dependents (at full cost), while Ford assumed half the cost of dependent coverage.

By 1967, GM and Ford had assumed the entire cost of retirees' healthcare benefits, including the benefits for dependents. The car companies added other healthcare benefits for retirees over the next 20 years: prescription-drug coverage in 1970; dental and hearing-aid coverage in 1976; and comprehensive vision coverage in 1979. GM extended coverage to substance abuse in 1984 and mental health in 1990. Because each agreement encompassed all hourly retirees, not just those who had retired after each new collective bargaining agreement was made, GM and Ford now provide healthcare coverage for all eligible retirees, their spouses and dependents—which is to say 472,000 people in GM's case and 174,000 people in Ford's case.

These benefits are not inexpensive. Accounting for active and retired workers and their families, GM provides healthcare to 1,100,000 people, making it the "single largest private purchaser of health care in the United States," with yearly expenditures of $5.4 billion in 2005 and with the lion's share (nearly $3.7 billion in 2005) going to retiree benefits. GM JA 614. Ford tells a similar story. It spent $3.5 billion to cover 590,000 people in 2005, with $2.4 billion going to retiree benefits. In 2005, these aggregate healthcare expenditures added $1,525 on average to the cost of every GM vehicle and $1,100 to the cost of every Ford vehicle. But for the legacy expenses—the retiree benefits—the healthcare costs per vehicle at GM and Ford would be $480 and $346, respectively. Their Japanese rivals spend an average of $450 per vehicle for *all* healthcare costs, in other words for the healthcare benefits of active workers *and* retirees.

No participant in this case—whether that party agrees with the settlement or not—offers any reason to believe these healthcare benefits will become cheaper over time, the car companies' capacity to pay them will become less burdensome in the future or the differential between what these American car companies pay in healthcare costs per vehicle and what their rivals from Japan (which has universal healthcare) pay will change any time soon. GM's accumulated post-retirement healthcare obligations increased from $42 billion in 2000 to $67.6 billion at the end of 2004; Ford faced $35 billion in accumulated obligations in 2005, an increase of $14 billion since 2000. By the end of 2004, GM's accumulated obligations amounted to almost seven times its market value; by the end of 2005, Ford's obligations amounted to almost three times its market value. Making these obligations increasingly more difficult to meet are a growing ratio of retirees to active employees (four to one at GM in 2006 and two to one at Ford in 2005) and rapidly increasing healthcare costs. *See, e.g.*, GM JA 615 (absent the settlement, GM's accumulated obligations were expected to increase 22% between 2005 and 2009); Ford JA 851 (retirees accounted for 80% of the increase in Ford's healthcare costs between 2000 and 2005).

*Declining Market Share*. Once the world's largest automotive manufacturer (and still Michigan's largest employer with 71,000 residents on its payroll), GM has seen its share of the North American market decline from 40% to 25.5% over the past 20 years. Ford's share has declined from 25% in 1995 to 17% ten years later. Over the last decade, profits at the two companies have declined and in some years disappeared. In 2005, GM's automotive division posted a pre-tax loss of $11.4 billion; Ford's automotive division lost $3.9 billion.

These problems have not been lost on the financial markets. In early 2005, both companies' credit ratings declined to non-investment grade status ("junk" status), in part due to GM's "burdensome postretirement benefit obligations," GM JA 606, and Ford's "massive unfunded retiree medical liability," Ford JA 863 (internal quotation marks omitted). GM's stock, priced at $53.40 at the end of 2003, fell to $19.42 over the next two years; its market capitalization slid from $30 billion to $11 billion. Ford's stock price decreased from $30 a share in 2001 to $7.72 by the end of 2005; its market capitalization fell from $54 billion to approximately $14 billion during that time.

*GM's Recovery Strategy and the Proceedings Below.* To address these fiscal challenges, GM has sought to scale back production and cut costs across the board. In 2005, GM "closed or idled" assembly plants in Maryland, Michigan and New Jersey to reduce excess capacity. GM JA 600. In addition, GM announced plans to close twelve assembly plants or facilities, to lay off 7,000 salaried employees and 30,000 hourly workers, to cut the salaries of senior leadership, to place caps on healthcare expenditures for salaried employees and retirees and to reduce its annual dividend to shareholders.

A central feature of GM's recovery strategy included reducing the burden of its accumulated healthcare obligations to hourly retirees. When the UAW refused to discuss the possibility of modifying hourly retirees' healthcare benefits in 2005, GM responded that it would unilaterally reduce the benefits. Although no retiree filed a lawsuit to block GM's action, the UAW stepped in and agreed to negotiate changes to retiree benefits on the condition that the company postpone any cuts until negotiations had concluded and that it "fully open its books and share its complete financial data" with the UAW. GM JA 351. An independent financial consultant, Lazard Freres & Co., LLC, reviewed this data for the UAW and concluded that GM had not embellished its fiscal woes.

On October 17, 2005, GM and the UAW announced an agreement that would permit the company to modify its retiree healthcare benefits. Because the two entities had no authority to act on behalf of the retirees, the UAW approached two hourly retirees (each of whom had been elected to a local retired workers chapter) about filing a class action against GM. At the UAW's suggestion, the retirees retained William T. Payne as lead class counsel. Among other qualifications, Payne had practiced law for 27 years and had litigated "approximately forty-seven" retiree healthcare class actions. On October 18, the UAW and the retirees jointly filed a class action lawsuit against GM under the Employee Retirement Income Security Act of 1974 and the Labor-Management Relations Act. *See* 29 U.S.C. §§ 185, 1132. The action sought a declaration "that the retiree health care benefits set forth in the applicable collective bargaining agreements . . . may not be unilaterally terminated or modified" by GM. GM JA 102. On October 29, the UAW notified retirees of the class action, informed them of the potential settlement with GM and explained that retirees would "have an opportunity to object to any aspect of the proposal." GM JA 239.

Over the next two months, the class representatives (through class counsel) reviewed all of the financial data GM had provided to the UAW and hired their own independent consultant to analyze the data. Although class counsel recognized that "there was a framework for this settlement already in place the day the complaint was filed," GM JA 1119, he became involved in negotiations while the settlement was "still being drafted," GM JA 256. On December 5, the consultant reported that "GM is experiencing significant financial strain . . . . Without cost sharing, and other measures, GM's ability to continue to provide retiree health benefits in the future could be endangered." GM JA 1261. On December 16, GM, the UAW and the class representatives agreed to a settlement.

On December 22, the district court certified a class of:

> All persons who, as of November 11, 2005, were (a) GM/UAW hourly employees who had retired from GM with eligibility to participate in retirement in the GM Health Care Program for Hourly Employees, or (b) the spouses, surviving spouses and dependents of GM/UAW hourly employees, who, as of November 11, 2005, were eligible for post-retirement or surviving spouse health care coverage under the GM Health Care Program for Hourly Employees as a consequence of a GM/UAW hourly employee's retirement from GM or death prior to retirement.

GM JA 340. The court appointed Payne as class counsel and preliminarily approved the settlement. The court also directed Payne to notify all class members (476,676 people) of the proposed

settlement. Class members received a notice explaining their rights, a complete copy of the settlement agreement and a cover letter from Payne and the UAW.

On March 6, 2006, the district court held a fairness hearing, at which it considered the objections to the settlement from 1,250 retirees. The court admitted declarations from GM, the UAW and the class in favor of the proposed settlement and declarations from GM retiree Leroy McKnight opposing it. McKnight called 23 class members who opposed the settlement as witnesses. The court certified the class and approved the settlement.

*Ford's Recovery Strategy and the Proceedings Below.* Ford has taken a similar route to "return its North American automotive operations to profitability," Ford JA 865: The company plans to close 14 manufacturing facilities by 2012, intends to cut $6 billion a year in material costs (such as steel) by 2010, has reduced officer ranks by 12%, has eliminated 4,000 salaried positions and has curtailed the pension and fringe benefits of the company's salaried employees.

Ford also announced in early 2005 that it intended to cut retiree healthcare benefits. The UAW started negotiations with Ford, and Ford disclosed its confidential financial projections to the UAW. After the UAW's financial consultant concluded that Ford's prospects were at least as dire as the company insisted, the UAW presented Ford with a package of proposed "modest cuts to retiree health benefits"—a package consistent with the framework it had negotiated with GM. Ford JA 1735–36. After further negotiations, Ford agreed to the framework.

The UAW approached several Ford hourly retirees about filing a class action against Ford, suggesting that Payne serve as class counsel. On December 13, the UAW and several hourly retirees filed a class action against Ford, seeking a declaration that the healthcare benefits provided to retirees under the collective bargaining agreements had vested. After learning of the negotiations between Ford and the UAW, Ford retiree Lawrence Bronson filed an independent class action on behalf of Ford hourly retirees on January 24, 2006, using the same law firm that represented McKnight.

On February 6, Ford, the UAW and the proposed class moved to certify the class and to appoint Payne as class counsel. One week later, they agreed to a final settlement. As with the GM litigation, the class representatives hired a financial consultant to review Ford's financial data and instructed class counsel to conduct a thorough analysis of relevant law before approving the deal.

On February 24, the district court certified a class consisting of:

> All persons who, as of December 22, 2005, were (a) Ford/UAW hourly employees who had retired from Ford with eligibility to participate in retirement in the Ford Hospital-Surgical-Medical-Drug-Dental-Vision Program ("Plan"), or (b) the spouses, surviving spouses and dependents of Ford/UAW hourly employees, who, as of December 22, 2005, were eligible for post-retirement or surviving spouse health care coverage under the Plan as a consequence of a Ford/UAW hourly employee's retirement from Ford or death prior to retirement.

Ford JA 475. The court also appointed Payne as counsel for the class, preliminarily approved the settlement agreement and ordered the parties to notify the class of the settlement agreement.

The Ford litigation suffered several fits and starts on its way to a fairness hearing. On March 22, the district court judge who had presided over the case up to that point recused himself, as did the next judge assigned to the case. After the action landed on the desk of a third judge, Bronson moved the court to revisit a number of issues, claiming that the class representation was inadequate, that the settlement was unfair, that certain declarants needed to attend the fairness

hearing, that the notice of settlement provided to class members was inadequate and that the objection period should be extended. The court rejected each contention.

On May 31, the district court held the fairness hearing, allowing all parties to submit declarations, testimony and other evidence, as well as briefs and oral argument. It also reviewed the objections of 800 class members to the settlement. The district court certified the class and approved the settlement agreement.

*The Settlement Agreements.* The two settlement agreements share a similar framework. They replace the current premium-free and deductible-free plan offered to retirees with two options: (1) a modified plan comprised of modest monthly premiums and substantial benefits or (2) a "catastrophic" plan with no monthly premiums but "higher deductibles, higher emergency room co-payments, and higher prescription drug payments." GM JA 275; Ford JA 303–04. In the long run, GM expects to reduce its annual healthcare expenditures by $3 billion and shed some $15 billion of its accumulated retiree healthcare obligations; Ford expects to shave more than $5 billion from its accumulated retiree healthcare obligations.

The modified plans impose several specific (and new) costs on retirees: a monthly premium of $50 for individuals, $105 for families; a yearly deductible of $300 for individuals, $600 for families; and a 10% co-insurance obligation for in-network healthcare services. Retirees also must assume part of the cost of prescription drugs: co-paying $5 for generics and $10 for brand-name drugs when purchased at retail. All of these costs, according to the plans, may not be raised by more than 3% per year for the life of the agreement.

Not all retirees must assume these new costs. Retirees entitled to an annual pension of less than $8,000—about 73,000 GM retirees and about 32,000 Ford retirees—retain substantially the same benefits they had before the settlement agreement.

And the retirees who must pay these new costs will not be required to pay all of them. Under the agreements, a substantial percentage of these costs will be paid for through a trust set up for that purpose—what the parties call a defined contribution "Voluntary Employees' Beneficiary Association trust," a DC-VEBA trust for short (if not for elegance). GM JA 267. GM will contribute $3 billion in cash to its DC-VEBA trust through 2011, along with at least $30 million a year in profit-sharing payments from 2006 through 2012 and additional payments based on increases in GM's stock price. Ford has promised $108 million in cash to its DC-VEBA trust through 2011, along with additional payments triggered by the appreciation of Ford's stock. The UAW also has agreed to fund the trusts by deferring negotiated wage and cost-of-living adjustments and contributing those negotiated increases to each company's respective trust—in all about $2,000 a year in contributions from each active employee. In GM's case, these foregone wages should add $4 billion to the trust over the next 20 years.

An independent committee administers the two trusts, using the funds generated by the trusts to reduce participant expenses. The trust funds will reduce monthly premiums to $10 for individuals and $21 for families, and out-of-pocket maximums will be limited to $250 for individuals and $500 for families for in-network health services. As a result, individual retirees can expect to pay a maximum of $370 and families a maximum of $752 a year for complete healthcare coverage during the first year of the plan. The trusts also will pay for retiree dental coverage. Although the modified plan does not guarantee any future level of cost reduction, estimates suggest that both trusts will be able to continue these reductions for at least 20 years.

The modified plan also attempts to reduce the overall cost of retiree healthcare benefits for the companies. The plan imposes a $50 co-payment on visits to the emergency room unless the retiree is admitted to the hospital. It requires higher co-insurance and out-of-pocket maximums for

the use of out-of-network healthcare services. It requires retirees who voluntarily choose an out-of-network provider to pay any charges above those deemed "reasonable and customary" in the industry. GM JA 309; Ford JA 342–43. And it coordinates benefits with Medicare, attempting to take advantage of the government coverage without reducing the benefits offered to retirees.

Although the settlement agreement contains no formal end date, the companies and the UAW have the right to terminate each agreement at any time after September 14, 2011. Should GM or Ford terminate its respective agreement after that date, each has agreed that "the Case Law as of the Effective Date [of the settlement] shall be treated as the applicable body of judicial decisional law for [subsequent] litigation" regarding the vesting of retiree healthcare benefits—though this provision does not apply to "legislative, regulatory, or administrative developments after the Effective Date." GM JA 296; Ford JA 325.

## II.

The arguments of the objectors, be they retirees of Ford or GM, fall into four general categories: (1) that the class representation was not "fair[] and adequate[]," Fed. R. Civ. P. 23(a)(4); (2) that the notice of the class settlement was not "reasonable," Fed. R. Civ. P. 23(e)(1)(B); (3) that the settlement agreements are not "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(1)(C); and (4) that the objectors should have been given additional discovery. Each of these decisions by the district court receives abuse-of-discretion review. *See Olden v. LaFarge Corp.*, 383 F.3d 495, 507 (6th Cir. 2004) (class certification); *Franks v. Kroger Co.*, 649 F.2d 1216, 1222–23 (6th Cir. 1981) (settlement class notice); *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO*, 803 F.2d 878, 880 (6th Cir. 1986) (settlement approval); *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996) (discovery).

## A.

Before a court may certify a class, it must ensure that the class satisfies each of Rule 23(a)'s requirements and that it falls within one of three categories permitted by Rule 23(b). *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc). Because Rule 23 is "designed to protect absentees by blocking unwarranted or overbroad class definitions," a district court must give "undiluted, even heightened, attention" to its protections before certifying a settlement-only class—one formed just for the purpose of settlement, not for litigation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

Many of Rule 23's demands require little discussion here. As to GM: the class, consisting of 476,676 retirees and dependents, is undoubtedly "so numerous that joinder of all members is impracticable," Fed. R. Civ. P. 23(a)(1); because the claims of all retirees stem from the collective bargaining agreements negotiated between GM and the UAW, they share "common" "questions of law or fact," Fed. R. Civ. P. 23(a)(2); the claims of the class representatives—that the retirees' healthcare benefits are vested under ERISA and the LMRA—generally are "typical" of the claims of every other member of the class, Fed. R. Civ. P. 23(a)(3); and GM has threatened to modify all retiree healthcare benefits unilaterally, "thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole," Fed. R. Civ. P. 23(b)(2). McKnight does not challenge any of these findings on behalf of the GM's objectors, and we see no reasonable basis upon which he could have done so. The same is true of the Ford class.

Both objectors instead start by targeting two related issues—the class representatives' ability to "fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), and the adequacy of class counsel, Fed. R. Civ. P. 23(g)(1)(B)–(C). Class representatives are adequate when it "appear[s] that [they] will vigorously prosecute the interests of the class through qualified counsel," *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976), which usually will be the

case if the representatives are "part of the class and possess the same interest and suffer the same injury as the class members," *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (internal quotation marks omitted). Because named class members must act through class counsel, adequacy of representation turns in part on "the competency of class counsel" and in part on the absence of "conflicts of interest." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982); *see* Fed. R. Civ. P. 23(g)(1)(C).

Even after accounting for the "undiluted, . . . heightened" attention that Rule 23(a)'s procedural safeguards receive in the context of settlement-only classes, *Amchem Prods.*, 521 U.S. at 620, the district courts did not abuse their discretion in certifying these classes and in determining that absent class members would be adequately represented. The named representatives are "part" of each class, and because all class members share a common claim—that the retirees' healthcare benefits have vested under the collective bargaining agreements—their legal interests parallel the named representatives' interests. *See E. Tex. Motor Freight Sys.*, 431 U.S. at 403. The GM and Ford retirees had another reason to trust these representatives: The retirees previously elected all but one of the named class members to represent them in another work-related capacity.

William Payne was competent to represent each class and did not have a conflict of interest. Payne has practiced labor law for almost 24 years, has litigated almost 50 retiree healthcare class actions at the trial and appellate levels, has authored numerous articles on the law of retirement benefits, has contributed to BNA's treatise on employee benefits and heads the American Bar Association's Subcommittee for Benefit Claims and Individual Rights. In view of Payne's background, both classes would have been hard pressed to find someone with greater "experience in handling class actions . . . and claims of the type asserted in the action" or an attorney with more "knowledge of the applicable law." Fed. R. Civ. P. 23(g)(1)(C)(i). Not only was Payne qualified, he also was prepared, if need be, to prosecute these cases: He had six attorneys plus substantial support staff ready to assist him; he retrieved and reviewed "boxes of materials" from GM and Ford, including all of the financial information the two companies shared with the UAW, GM JA 256; Ford JA 274; he hired an independent financial consultant to analyze the fiscal health of the companies; and by all appearances he thoroughly investigated the potential claims of both classes under ERISA and the LMRA. Payne, in brief, was willing to, and indeed did, commit substantial "resources . . . to representing the class[es]." Fed. R. Civ. P. 23(g)(1)(C)(i).

More, Payne's involvement in the negotiations was an essential check on the process, safeguarding the rights of absent class members. Unaffiliated with the UAW or the companies, both professionally and financially, Payne had every incentive to press the classes' claims and, if appropriate, to reject the settlement framework proposed by GM, Ford and the UAW. Payne remained free to recommend the proposed framework to the classes and free to negotiate the terms of the final settlement, which was "still being drafted," GM JA 256, on behalf of the classes. And Payne did both of these things—negotiating in a few discrete instances with GM and the UAW and ultimately recommending a settlement to the GM retirees because, in Payne's considered judgment, "the burdens and expense of litigation, . . . the risks and uncertainties associated with protracted trials and appeals, [and] the risks and uncertainties of recovering from a potentially insolvent entity" outweighed "the relatively small burden which the Class would absorb by the acceptance of cost-sharing." GM JA 441. Payne had similar discretion in the Ford litigation and made the same considered recommendation to the Ford retirees.

The objectors counter that the representation was inadequate because, during the negotiations, the UAW "lack[ed] the authority to take measures that would impair the retirees' rights without their consent." McKnight Br. at 22; Bronson Br. at 22. But the UAW's lack of authority to diminish retirees' benefits without their consent, *see Cleveland Elec. Illuminating Co. v. Utility Workers Union of Am.*, 440 F.3d 809, 817 (6th Cir. 2006), does not speak to the adequacy of class counsel's representation. While the UAW no doubt insisted that the car companies respect the rights

of the retirees during the initial negotiations, it did not purport to bind the retirees in the negotiations. That was Payne's job. He evaluated the options of retirees on their behalf, and the decision to accept or reject the settlement was left to the named class representatives.

The objectors' suggestion that the UAW compromised the vested benefits of the retirees suffers from the same flaw. The UAW had no such authority and never purported to exercise it. In the final analysis, the named class members—not the UAW—represented the retirees of each company, removing the risk of any conflict between the interests of the UAW and the retirees.

The objectors next contend that the UAW exercised undue influence in selecting the named class members and class counsel, undermining the "structural assurance of fair and adequate representation." *Amchem Prods.*, 521 U.S. at 627; *see also Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (warning that, if given free reign, the opposing party will choose "the most ineffectual class lawyers to negotiate a settlement"). But the UAW's involvement—referring several potential class representatives to Payne, *see* GM JA 435; Ford JA 719—does not suffice to condemn the class. For one, the UAW had little choice but to get involved. When GM (and later Ford) announced that it would unilaterally reduce retiree healthcare benefits, no retiree filed suit. When the UAW blocked that action and negotiated with the car companies for the next six months, no retiree filed suit. And when the UAW and the companies were ready to negotiate with the retirees, no one retiree had authority to negotiate on behalf of the other retirees. At that point, the UAW and the companies had no choice but to seek potential class representatives—and they limited their involvement to referring already trusted members of the class to an experienced and independent counsel. If this limited and necessary involvement constituted undue influence, what would not? *Cf. Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1189 (10th Cir. 2002) (rejecting collusion argument that "would lead to the conclusion that no settlement could ever occur in the circumstances of parallel or multiple class actions") (internal quotation marks omitted).

For another, courts customarily demand evidence of improper incentives for the class representatives or class counsel—such as a promise of excessive attorney fees in return for a low-cost, expedited settlement—before abandoning the presumption that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process demands. *See, e.g.*, *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 308 (3d Cir. 2005) (noting the "special danger of collusiveness when the attorney fees . . . were negotiated simultaneously with the settlement"); *Reynolds*, 288 F.3d at 282–84; *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991). No such problem exists here, as the settlement does not determine Payne's fees; ERISA does, and it says that a district court may "in its discretion . . . allow a reasonable attorney's fee." 29 U.S.C. § 1132(g)(1). Without more, we must afford Payne and the class representatives the normal presumption—that they handled their responsibilities independently and zealously.

The objectors add that, even if Payne tried to represent the class vigorously, he lacked the power to do so because he "had no practical ability to request changes to the proposed settlement." McKnight Br. at 27; *see* Bronson Br. at 27. To the extent the objectors mean to suggest that Payne was legally precluded from litigating the case—"disarmed" from pressing for a "better offer" in the words of *Amchem Products*, 521 U.S. at 621—that is wrong because Payne appeared to represent a coherent class that could have proceeded to trial but did not, unlike the "sprawling" class action in *Amchem Products* that never could have proceeded to trial in the first place, *id.* at 624.

To the extent the objectors mean to complain that, as a practical matter, Payne had little hope of altering the proposed settlement agreements by the time he entered the picture, that also does not show the inadequacy of his representation. The question is whether Payne had authority to reject the settlement on behalf of the class or insist on modifications, not whether Payne was likely to succeed if he took that course.

The record, moreover, confirms that Payne exercised this authority in a reasonable way. In his considered view, the benefits of the proposed framework outweighed the value of any remedy that litigation might produce. Notably, the companies and the UAW—not known historically as congenial negotiating allies—came to the same view about the same risks: Would the retirees or the car companies win the vesting argument? And even if the retirees won the vesting argument, would the car companies be able to make good on these benefits obligations without entering bankruptcy? And if the car companies sought Chapter 11 relief, what kinds of benefits would retirees receive in the end? The settlements also offered something that the retirees could never have obtained on their own—substantial contributions to the DC-VEBA trusts from existing employees and a modification to the collective bargaining agreements that the UAW alone could negotiate, both of which helped to address the problem of ensuring a future funding stream for these benefits.

Yes, the car companies and the UAW told the retirees (and Payne) that the settlement agreements were being offered on a take-it-or-leave-it basis. But there is no way of knowing whether they meant it. Surely this would not have been the first time that a party insisted that it would never consent to additional changes to a proposed bargain—and then consented. The question is whether each class had the right to reject that offer: Each did. And the question is whether Payne acted reasonably as class counsel in recommending that class members approve the settlement as is: He did— particularly since the UAW at that point already had convinced active employees to make substantial contributions to the DC-VEBA trust and since any additional changes to the settlement would have required a new ratification by active workers, the same workers who barely approved the settlement the first time around—at least in Ford's case. *See* GM JA 444 (Ford Memorandum of Understanding passed by 51% to 49% margin).

The objectors maintain that the terms of the settlement created improper intraclass conflicts—and that the district court as a result should have divided the class into subclasses based on age and income. *See* McKnight Br. at 33–36; Bronson Br. at 32–35; *accord* Fed. R. Civ. P. 23(c)(4)(B). In support, they point out that a class representative with a pension "significantly" above the threshold would have "little incentive to ensure that the financial burdens of the settlement are fair to those retirees receiving pensions just above the threshold." McKnight Reply Br. at 18; *see* Bronson Reply Br. at 17. No doubt, the district courts could have drawn additional class lines, but they did not abuse their discretion in choosing not to do so. Other, equally tenable lines could have been drawn with equal force: between retirees living alone and those with dependents; between retirees needing brand-name drugs, those using generics and those who rarely (if ever) use pharmaceuticals; between retirees whose preferred physician is in the network and those who frequent out-of-network doctors; between those with significant dental costs and those with none; and so on. Yet if every distinction drawn (or not drawn) by a settlement required a new subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk fragmenting the class beyond repair. *See In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005) ("[I]f subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened.") (internal quotation marks omitted); *Clark Equip.*, 803 F.2d at 880 ("Subclassing . . . is appropriate only when the court believes it will materially improve the litigation" and is not always necessary because "subclassing often leads to more complex and protracted litigation."). Neither the Federal Rules of Civil Procedure nor the Supreme Court requires that settlements offer a pro rata distribution to class members; instead the settlement need only be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(C); *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999) (Although "[f]air treatment in the older cases was characteristically assured by straightforward pro rata distribution" of proceeds of the litigation amongst the class, "equity in such a simple sense" may be "unattainable" in complex cases.).

B.

Before ratifying a proposed settlement agreement, a district court also must "direct notice in a reasonable manner to all class members who would be bound" by the settlement. Fed. R. Civ. P. 23(e)(1)(B). The notice should be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see also In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984) (upholding notice that "described the terms of the settlement, the reasons for [class representatives' decision to settle], the legal effect of the settlement and the rights of the [class members] to voice their objections").

The district courts did not abuse their discretion in approving either class notice. The notice in the GM case clearly explained its purpose, discussed the nature of the pending suit and proposed class and accurately summarized the 76-page settlement agreement and incorporated exhibits in a little over four pages. Also enclosed with the notice was a copy of the settlement agreement, ensuring that retirees would have full access to the very document the district court would examine at the fairness hearing. The Ford class notice was equally satisfactory.

The objectors insist that the notice was misleading because it did not say that retirees could challenge the proposed class certification as well as the settlement. But the applicable rule contains no such requirement. While an opt-out class action under Rule 23(b)(3) must meet stringent notice requirements, *see* Fed. R. Civ. P. 23(c)(2)(B), a district court need not provide *any* notice before certifying a mandatory class action under Rule 23(b)(2), *see* Fed. R. Civ. P. 23(c)(2)(A) ("For any class certified under Rule 23(b)(1) or (2), the court *may* direct appropriate notice to the class.") (emphasis added). No less importantly, Rule 23(e) grants members the right to "object to a proposed settlement," Fed. R. Civ. P. 23(e)(4)(A), not the right to object to certification. And while we have inferred that class members might object to the settlement because the class should not have been certified in the first place, *see In re Telectronics Pacing Sys., Inc.*, 221 F.3d 870, 876 (6th Cir. 2000); *accord* Fed. R. Civ. P. 23(c)(1)(C), there is no textual warrant for requiring a notice to lay out every reason a class member might object to the settlement. *See* Fed. R. Civ. P. 23(e)(1)(B) (requiring the court only to "direct notice in a reasonable manner").

Also unavailing is the objectors' suggestion that the notice was "misleading because it repeatedly implied that the proposed settlement was the product of arm's length negotiations" and "failed to inform class members" that the UAW "had a serious conflict of interest." McKnight Br. at 46–47; *see* Bronson Br. at 48. Again, Rule 23(e) does not require the notice to set forth every ground on which class members might object to the settlement—nor even every reason that McKnight or Bronson do object. All that the notice must do is "fairly apprise the prospective members of the class of the terms of the proposed settlement" so that class members may come to their own conclusions about whether the settlement serves their interests. *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975) (internal quotation marks omitted).

The objectors add that other communications between class representatives and class members tarnished the original notice. A letter sent to retirees of both car companies, however, merely spelled out the reasons why the class representatives and the UAW thought the settlement was appropriate, *see* GM JA 658–59; Ford JA 996–97, but it did not purport to come from the district court and thus did not alter the neutrality of the class notice. While some retirees may not have objected to the settlement out of respect for the UAW's judgment (which seems to be the objectors' primary concern), this letter could not have been the underlying source of that concern. The class notice itself informed class members that the UAW supported the settlement.

C.

Before approving a settlement, a district court must conclude that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(C); *see* Fed. R. Civ. P. 23(e)(1)(A). Several factors guide the inquiry: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest. *See Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992); *Williams v. Vukovich*, 720 F.2d 909, 922–23 (6th Cir. 1983).

The fairness of each settlement turns in large part on the bona fides of the parties' legal dispute. Although this inquiry understandably does not require us to "decide the merits of the case or resolve unsettled legal questions," we cannot "judge the fairness of a proposed compromise" without "weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *see In re Gen. Tire & Rubber*, 726 F.2d at 1086. The retirees' claims rest on one question: Do the collective-bargaining agreements vest former union workers with their healthcare benefits upon retirement? As the parties see it, two lines of Sixth Circuit cases offer competing answers.

The retirees and the UAW point to the *Yard-Man* line of cases as support for their position that the retirees' healthcare benefits vested upon retirement. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983) (holding that there was "sufficient evidence" of intent to vest retirees with benefits "in the language of [the] agreement itself"); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 773–74 (6th Cir. 1999); *Smith v. ABS Indus., Inc.*, 890 F.2d 841, 846 (6th Cir. 1989). Consistent with these cases, they argue, both collective bargaining agreements contain the requisite vesting language: "The health care coverages an employee has at the time of retirement . . . shall be continued." GM JA 785; *see also* Ford JA 1033 ("The continued coverage to which eligible retired employees are entitled will be the hospital-surgical-medical-drug-dental-vision-hearing aid coverages as described . . . above.").

GM and Ford invoke the *Sprague* line of cases—to the effect that "an employer's commitment to vest" must be stated "in clear and express language" in the plan documents. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998) (en banc) (internal quotation marks omitted). Consistent with these cases, they argue, a reservation of rights to modify retiree healthcare benefits is inconsistent with the claim that those benefits have irreversibly vested, *see Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 919 (6th Cir. 2000); *BVR Liquidating*, 190 F.3d at 773, and note that the two companies' retiree healthcare plans contain such a reservation, *see* GM JA 550 ("Any rate of payment by the enrollee and any other terms and conditions of the Program may be changed at any time by the Corporation."); Ford JA 1030 ("It is understood that the provisions herein . . . are agreements between the Company and the Union and, although they set forth intended arrangements involving third parties, they shall not be relied upon by any such third party as establishing any right for it against the Company or the Union."); Ford JA 1041 (From the summary plan description: "The Company reserves the right to end, suspend or amend these plans, subject to the applicable Collective Bargaining Agreement. . . . If changes are made, you will be notified.").

Our task is not to decide whether one side is right or even whether one side has the better of these arguments. Otherwise, we would be compelled to defeat the purpose of a settlement in order to approve a settlement. The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement. A brief review of the above language from the collective bargaining agreements and these cases proves that is the case.

What makes these settlements particularly sensible, moreover, is that, even if this merits question favored one party over the other, the retirees still would have had ample reason to control the resolution of this dispute through negotiation today rather than litigation tomorrow. If we decided for the sake of argument that the retirees were likely to lose the *Yard-Man/Sprague* debate, little would stand in the way of the car companies' reducing or even eliminating the retirees' healthcare benefits in the future. If we decided for the sake of argument that the retirees were likely to win the debate, any such victory would run the risk of being a Pyrrhic one because the cost of insisting on irreversible healthcare benefits might well be—and indeed almost certainly would be—the continuing downward spiral of the companies' financial position. If GM's automotive divisions lost $11.4 billion in 2005 while spending $3.7 billion to pay retiree healthcare benefits (and Ford's division lost $3.9 billion while spending $2.4 billion on retirees), it takes little imagination to picture the future financial toll this burden would place on the two companies. While we need not embellish the point by raising the prospect of bankruptcy, it is well to remember that the Federal Government's Pension Benefit Guaranty Corporation, which provides *pension* guarantees for the employees and retirees of financially distressed companies, has no sister agency that provides the same guarantees for retiree *healthcare* benefits.

In view of the risks the retirees faced from losing *and* winning the *Yard-Man/Sprague* debate, it is no wonder that Payne recommended settlement to the class representatives; no wonder that the named representatives consented to each settlement; no wonder that less than one half of one percent of class members objected to either settlement, *see* GM JA 154; Ford JA 183; and no wonder that both district courts thought that the settlement was a fair way of handling the risks of litigation, *see* GM JA 140 ("[C]ost increases entailed by the settlement are modest . . . [and] [t]he potential loss of *all* benefits, due to either GM's financial collapse or GM's prevailing on the merits, would be far more harsh for Class Members."); Ford JA 174–75 (approving the settlement in light of "the realities of Ford's financial position and the potential for catastrophic consequences to the class of a loss, no matter how small the risk"). And in view of the other factors we must consider—the federal policy favoring settlement of class actions, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004), the signal importance of GM and Ford to the economies of Michigan and the country, *see* GM JA 155–56; Ford JA 182, and the extensive information-sharing between the companies, the UAW, the class representatives and even McKnight and Bronson that preceded the settlements, *see* GM JA 359—it is no wonder that both district courts approved the final settlements as "fair, reasonable, and adequate" under Rule 23(e)(1)(C). *See* GM JA 175; Ford JA 210. We see it the same way.

The objectors resist this conclusion on the ground that the settlements were sullied by collusion—as shown by the UAW's alleged conflict of interest, the fact that the parties settled soon after the litigation began and the similarity of the settlements. The UAW's alleged conflict of interest does not affect the fairness of either settlement because the named class members, not the UAW, legally represented the class and made the final decision to accept each proffered settlement.

The timing of a settlement by itself does not establish collusion. As our court has recognized, a "tentative settlement can precede or be concurrent with class certification," *Clark Equip.*, 803 F.2d at 881; something more is required to indicate collusion, *see, e.g.*, *Newby v. Enron Corp.*, 394 F.3d 296, 306–07 & n.18 (5th Cir. 2004) (noting that while "[o]bjectors . . . smell[ed] a fix because of the timing of the preliminary settlement," they did not offer "the slightest factual substantiation" of collusion); *see also, e.g.*, *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir. 1987) (noting that "[n]othing in the terms or timing" suggests collusion when class action settled within a year of being filed). The timing of these settlements, at any rate, has a far-from-nefarious explanation. Because the UAW, GM and Ford had resolved most of their differences by the time each class was formed and because they had resolved those differences on a time-is-of-the-essence basis (in view of the companies' urgent fiscal needs), each company had ample reasons for offering the retirees a settlement at the start of the litigation.

The parallels between the frameworks of the two settlements also do not undermine their validity. As Bronson correctly acknowledges, GM and Ford "were bound by similar" pre-existing collective bargaining agreements. Bronson Reply Br. at 20. The UAW negotiated both collective bargaining agreements and faced the prospect of obtaining the consent from the active workers of both car companies in approving the settlements. Under these circumstances, it made considerable sense for the UAW to insist that each company's set of workers embraced a similar settlement framework.

The objectors also point to the unfairness of three features of the settlements: the lack of a guarantee for the DC-VEBA trusts; the provision that requires retirees to pay any costs above those deemed "reasonable and customary" when they use an out-of-network provider, *see* GM JA 309; Ford JA 342–43; and the provision allowing the companies and the UAW to terminate the settlement in 2011, *see* GM JA 294; Ford JA 323. The absence of a guarantee is understandable because the underlying legal debate turns in part on whether a guarantee is required, and this feature of the settlement poses little near-term risk because actuarial experts estimate that the mandatory contributions by the car companies and active employees will keep the DC-VEBA trusts solvent for at least 20 years. *See* GM JA 1300; Ford JA 1718. The out-of-network provider provision is a sensible way of reducing overall healthcare costs without imposing additional costs on retirees or active workers. And the termination provision allows the two sets of parties funding the DC-VEBA trusts—the UAW *and* the car companies—to end the agreement if it becomes unworkable and, even then, merely returns the retiree objectors to the position they wish to occupy today—of litigating the high-stakes vesting question.

The objectors also say that the settlements violate the Age Discrimination in Employment Act because they coordinate the provision of retiree healthcare benefits with the provision of Medicare benefits—in the sense that the plans will not reimburse Medicare-eligible retirees for expenses that Medicare would otherwise pick up itself. *See* 29 U.S.C. § 623(a)(1). Nothing about this "wrap-around" program, and the sensible savings stemming from it, indicates that the settlements are motivated by age animus or that they otherwise discriminate on the basis of age. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993) ("When the employer's decision *is* wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age . . . ."). The settlements do not determine eligibility on the basis of age—or even Medicare eligibility—but merely ask all employees to take advantage of a healthcare subsidy provided by the Federal Government before taking advantage of a healthcare subsidy provided by the companies. "An employer does not violate the Act by permitting" the government (rather than the employer itself) to provide "certain benefits . . . even though the availability of such benefits may be based on age." 29 C.F.R. § 1625.10(e); *accord Erie County Retirees Ass'n v. County of Erie, Pa.*, 220 F.3d 193, 216 (3d Cir. 2000); *accord also* Age Discrimination in Employment Act; Retiree Health Benefits, 68 Fed. Reg. 41,542, 41,549 (proposed July 14, 2003) (to be codified at 29 C.F.R. § 1625.32(b)) (EEOC regulation that would "exempt from all prohibitions of the Act such coordination of retiree health benefits with Medicare or a comparable State health benefit plan"); *Am. Ass'n of Retired Persons v. EEOC*, 489 F.3d 558, 568 (3d Cir. 2007) (holding that the proposed regulation "is within the EEOC's authority under the ADEA and valid" under the Administrative Procedures Act).

Our biggest concern about the settlements arises from a provision that no one challenges—the term that purports to freeze in time the "case law," though not the legislation or regulations, that will govern any future dispute about the vesting of these retiree healthcare benefits. *See* GM JA 296 ("[I]t is the express intention and agreement of GM, the UAW and Class Members to apply the Case Law as it exists as of the Effective Date [of the settlement] to any litigation . . . over . . . whether [retiree healthcare] benefits are vested should this Settlement Agreement be terminated by GM . . . subject to any and all changes in the applicable law from subsequent legislative, regulatory, or administrative developments . . . ."); Ford JA 325 (same as to Ford). This

is not an everyday settlement term. While the right to negotiate risk represents a premise of all settlements, we are not aware of any precedent for dealing with risk in *this* way: of permitting litigants to require courts to resolve their disputes on the basis of case law from one era over another—on the basis of Warren Court precedents over, say, Rehnquist Court precedents. At oral argument, the parties could not point to any precedent for such a provision or indeed to any other collective bargaining agreement that contained anything like it. And we have serious doubts about the authority of private parties to dictate what judicial precedents a court may consider in resolving a case or controversy brought before it.

Yet we need not resolve today whether Article III or state or federal law permits the parties to include this term in the settlement agreement or would allow a court to enforce it. The provision may never be invoked because it comes into play only when one of the parties terminates the agreement. At the earliest, the provision could be invoked in 2011 when the parties have authority to back out of the agreement. Not only does it make sense to await resolution of this novel question if and when it springs into an enforceable existence, but the contours of the question remain unclear. To avoid this serious constitutional question, a court might well construe the provision to avoid or ameliorate it. *Cf. Jones v. United States*, 529 U.S. 848, 858 (2000) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.") (internal quotation marks omitted); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *Califano v. Yamaski*, 442 U.S. 682, 693 (1979). A court's responsibility to assess the "fairness" of a settlement does not require it to ascertain every potential interpretation of the agreement before there is even a dispute about its meaning.

The agreements, it is true, say that the *disapproval* of any one term of the agreement requires the invalidation of the entire agreement. *See* GM JA 293; Ford JA 322. But the agreement does not say that it may be enforced only after a court affirmatively blesses every one of its provisions. At oral argument, we asked counsel for the parties and the objectors if they opposed this solution—which is to say, waiting until a party seeks to enforce the freezing-case-law-in-time provision before construing it and ascertaining its validity. No one objected to this approach or said that it otherwise slighted the intent of the settling parties. We therefore wait for another day, a day that may never come, to decide how or whether a party may enforce this provision.

D.

A fairness hearing contains several procedural safeguards: Parties to the settlement must proffer sufficient evidence to allow the district court to review the terms and legitimacy of the settlement, *In re Gen. Tire & Rubber*, 726 F.2d at 1084 n.6; class members "may object to [the] proposed settlement" on the record, Fed. R. Civ. P. 23(e)(4)(A); and class members have a right to participate in the hearing, *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986); *Williams*, 720 F.2d at 921. In satisfying these requirements, a district court has wide latitude. It "may limit the fairness hearing to whatever is necessary to aid it in reaching an informed, just and reasoned decision" and need not endow objecting class members with "the entire panoply of protections afforded by a full-blown trial on the merits." *Tenn. Ass'n of Health Maint. Orgs. v. Grier*, 262 F.3d 559, 567 (6th Cir. 2001) (internal quotation marks omitted). Objecting class members also do not have a vested "entitle[ment] to discovery." *In re Gen. Tire & Rubber*, 726 F.2d at 1084 n.6. A district court, moreover, need grant objectors discovery only if they can make a colorable claim that the settlement should not be approved. *See Geier v. Alexander*, 801 F.2d 799, 809 (6th Cir. 1986) ("To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process. . . . [U]nless the objectors have made a clear and specific showing that vital material was ignored by the District Court[,] [t]here is no need for the District Court to hold

an additional evidentiary hearing on the propriety of the settlement.") (internal quotation marks omitted).

GM, Ford, the UAW and the classes presented ample evidence to aid the district courts in evaluating the propriety of these settlements. That evidence included a history of retiree healthcare benefits at GM and Ford; financial records showing the fiscal burden that retiree healthcare imposes on each company; financial data underscoring each company's recent difficulties and estimates of each company's expected growth and earnings; analyses of that data by two sets of independent financial experts, one hired by the UAW, one by the class; a procedural history of each case, including how each class was formed; the arguments of Payne and the UAW, on the one hand, and GM and Ford, on the other, regarding the underlying legal claims; the Memorandums of Understanding ratified by the active workers of each company; the final settlement itself along with estimates as to how the DC-VEBA trusts would operate to mitigate the costs imposed on retirees; numerous affidavits regarding the public interest in the continued viability of the two companies; and Payne's own explanation for why he supported the settlements. The district courts also considered the objections offered by absent class members, along with the live testimony presented by McKnight and Bronson at each of the fairness hearings. On this record, the district courts plainly had sufficient evidence and legal arguments before them to assess the propriety of each settlement.

No matter, the objectors respond, because it all came to nothing "beyond a few hearsay declarations." McKnight Br. at 42; Bronson Br. at 41. But no court of appeals, to our knowledge, has demanded that district courts invariably conduct a full evidentiary hearing with live testimony and cross-examination before approving a settlement. Our court, and several others, have instead deferred to the district court's traditionally broad discretion over the evidence it considers when reviewing a proposed class action settlement. *See Tenn. Ass'n of Health Maint. Orgs.*, 262 F.3d at 567 (approving of the district court's "discretion to limit the fairness hearing . . . so long as [it is] consistent with the ultimate goal of determining whether the proposed settlement is fair, adequate and reasonable"); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1149 (8th Cir. 1999) (rejecting argument that district court should have required an evidentiary hearing prior to ruling on settlement when proponents "submitted voluminous supporting memoranda with citations to affidavits and deposition testimony"); *Edwards v. City of Houston*, 37 F.3d 1097, 1119 (5th Cir. 1994) ("Neither intervenors nor objectors are entitled to hold consent decrees hostage and require a full-blown trial in lieu of a fairness hearing."); *Mars Steel*, 834 F.2d at 684 ("The temptation to convert a settlement hearing into a full trial on the merits must be resisted."); *cf. Rutter & Wilbanks*, 314 F.3d at 1189. Nor, at all events, have the objectors shown how the absence of a full trial harmed them. *See* Fed. R. Civ. P. 61.

Also deficient is the objection that the reports submitted by the parties' independent financial experts did not satisfy Evidence Rule 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Rule 702 argument, again, overlooks the differences between a full trial and a fairness hearing. In a trial, the judge must strictly screen expert opinions for "evidentiary relevance and reliability" because a jury often has difficulty assessing such evidence. *Id.* at 594–95. In a fairness hearing, the judge does not resolve the parties' factual disputes but merely ensures that the disputes are real and that the settlement fairly and reasonably resolves the parties' differences. The *Daubert* objection suffers from the same problem, and, what is more, this screening requirement remains "a flexible one," *id.* at 594, and the objectors simply have not shown how the district courts abused their discretion in considering these financial reports. *See* GM JA 184 ("[T]he methodology underpinning the declarations at issue appear[s] to meet the standard established in *Daubert*."); Ford JA 204 ("[I]t is clear that the expert opinions . . . would be admissible because they are relevant and reliable . . . . The qualifications and experience of [the experts] . . . attest to their ability to conduct financial and actuarial analysis."); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997).

The objectors next argue that they could not fully participate in the fairness hearing because they were denied discovery about the settlement negotiations. But objecting class members "are not automatically entitled to discovery." *In re Gen. Tire & Rubber*, 726 F.2d at 1084 n.6. A district court need grant discovery only if the objectors make a colorable claim that the settlement should not be approved, *see Geier*, 801 F.2d at 809, and neither McKnight nor Bronson has made any such showing here.

Bronson fires two parting shots, both wide of the mark. He claims that the district court should have reviewed the preliminary certification of the Ford class after the first district judge recused himself from the case. *See* Bronson Br. at 37–38. But the new judge did that very thing. *See* Ford JA 166–70. He then claims that the district court erred in denying his motion for relief from judgment based on Ford's "announcement that it is offering buyouts to 75,500 hourly workers." Bronson Br. at 42. Because Bronson has not appealed this September 19, 2006 order, we have no jurisdiction over it. *See* Ford JA 213 (appealing order entered by court "on the 13th day of July, 2006").

III.

For these reasons, we affirm, though for the reasons stated in the opinion we defer considering the precise meaning and validity of the provision that purports to freeze in time the "case law" that will govern any future dispute over the vesting of the retirees' healthcare benefits.