RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0113p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JANE DOES 1–2,

> *Plaintiffs-Appellees*,

EVA CABRERA and BRITTNEY HALVERSON (17-1801);
B.D. (17-1802); C.T. (17-1827),

> *Objectors-Appellants*.

Nos. 17-1801/1802/1827

*v.*

DÉJÀ VU CONSULTING, INC., dba Déjà Vu of Saginaw,
Inc., nka Déjà Vu Services, Inc., et al.,

> *Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:16-cv-10877—Stephen J. Murphy, III, District Judge.

Argued: October 17, 2018

Decided and Filed: June 3, 2019

Before: COLE, Chief Judge; WHITE and NALBANDIAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Harold L. Lichten, LICHTEN & LISS-RIORDAN, P.C., Boston, Massachusetts, for all Appellants. Jason J. Thompson, SOMERS SCHWARTZ, P.C., Southfield, Michigan, for Jane Doe Appellees. Bradley J. Shafer, SHAFER & ASSOCIATES, P.C., Lansing, Michigan, for Déjà Vu Appellees. **ON BRIEF:** Harold L. Lichten, Shannon Liss-Riordan, Matthew Thomson, LICHTEN & LISS-RIORDAN, P.C., Boston, Massachusetts, for Appellants in 17-1801. Bradley J. Shafer, Matthew J. Hoffer, SHAFER & ASSOCIATES, P.C., Lansing, Michigan, for Déjà Vu Appellees. Charles P. Yezbak, III, Daniel Eduardo Arciniegas, YEZBAK

LAW OFFICES, Nashville, Tennessee, for Appellant in 17-1802.  W. Allen McDonald, LACY, PRICE & WAGNER, P.C., Knoxville, Tennessee, for Appellant in 17-1827.  Beth M. Rivers, PITT MCGEHEE PALMER & RIVERS, P.C., Royal Oak, Michigan, for Jane Doe Appellees.

COLE, C.J., delivered the opinion of the court in which NALBANDIAN, J., joined, and WHITE, J., joined in part.  WHITE, J. (pp. 17–22), delivered a separate opinion dissenting in part.

_____

**OPINION**

_____

COLE, Chief Judge.  After a class of 28,177 exotic dancers alleged that Déjà Vu dance clubs violated the Fair Labor Standards Act and state wage-and-hour laws, Déjà Vu and the class of dancers entered into a settlement agreement.  The district court approved the settlement over the objections of four class members who now appeal, arguing that the settlement was fundamentally unfair and failed to comport with procedural requirements for class action settlements.  Because the district court did not abuse its discretion in approving the settlement, we affirm.

**I.**

This class of dancers was not the first to sue Déjà Vu for alleged Fair Labor Standards Act ("FLSA") and state law violations.  In 2008, a class of dancers filed a class action lawsuit in the Eastern District of Michigan, alleging that two dance clubs—Cin-Lan, Inc., and Déjà Vu Consulting, Inc.—misclassified them as non-employees or independent contractors in violation of the FLSA and the Michigan Minimum Wage Act.  Over the next three years, the parties engaged in extensive discovery and motion practice.  After more than six months of negotiations, they entered into a settlement agreement that provided the dancers monetary compensation and injunctive relief.  The district court approved the settlement ("*Cin-Lan* Settlement") and retained jurisdiction to ensure its enforcement.  *Doe v. Cin-Lan, Inc.*, No. 08-CV-12719, 2011 WL 13266312 (E.D. Mich. July 15, 2011).

On March 10, 2016—five years after the approval of the *Cin-Lan* Settlement—another dancer ("Jane Doe 1") filed a complaint against Déjà Vu Consulting, its affiliate dance clubs, and

its owner Harry Mohney (collectively, "Déjà Vu") in the Eastern District of Michigan. Jane Doe 1 filed the complaint as both a class action under Federal Rule of Civil Procedure 23 and a collective action under 29 U.S.C. § 216(b) of the FLSA, seeking to bring the action on behalf of herself and "*[a]ll exotic dancers who worked for Defendants and were misclassified by Defendants as independent contractors at any time in the past three years*" (collectively, "the Dancers"). (Compl., R. 1, PageID 24–25 (italics in original).) This lawsuit involves the same class counsel, many of the same dancers, one of the same defendants, and similar claims as the initial *Cin-Lan* dispute. Specifically, the Dancers allege that Déjà Vu's clubs violated the FLSA and state wage-and-hour laws by "intentionally misclassif[ying] class members as independent contractors, refus[ing] to pay minimum wage, unlawfully requir[ing] employees to split gratuities, and unlawfully deduct[ing] employee wages through rents, fines, and penalties." (Op. & Order, R. 77, PageID 4200.)[1]

Déjà Vu filed a motion to dismiss or stay proceedings in favor of arbitration on September 16, 2016, and it attached a copy of Jane Doe 1's Dancer Performance Lease agreement, which included a clause mandating binding individual arbitration for all claims arising out of her performances.

Before the district court made any rulings on the merits, the parties began negotiating a settlement agreement. On December 28, 2016, the Dancers' attorneys notified the court that they had "executed a tentative term sheet on a settlement." (Mot. to Transfer Case, R. 22, PageID 445.) Additionally, the Dancers filed a motion requesting an intra-district transfer of the case to the same judge who retained jurisdiction over the *Cin-Lan* settlement, both because the case invokes his continuing jurisdiction and because he was "intimately familiar with the facts and circumstances of the parties' dispute after presiding over the prior case for approximately four years." (*Id.* at PageID 446.) On January 4, 2017, the district court granted the motion to transfer.

---

[1]Although the *Cin-Lan* case involved similar allegations, the *Cin-Lan* settlement did not mandate that the clubs convert the dancers from independent contractors to employees.

After negotiation, the parties reached a settlement agreement ("Settlement Agreement"). In exchange for releasing their claims against Déjà Vu, the Settlement Agreement provides the Dancers with injunctive and monetary relief.

The injunctive relief is structured around the Settlement Agreement's requirement that every club provide its current dancers with an Entertainer Assessment Form. This assessment determines whether the dancer should be classified as an employee or an Independent Professional Entertainer ("IPE"), the latter of which is akin to an independent contractor. The Settlement Agreement requires dancers to complete the assessment before they can perform at any of Déjà Vu's clubs. The assessment must then be verified by the club's Certified Public Accountant.

The remaining injunctive relief turns on whether the assessment determines the dancer in question is an employee or an IPE. Under the Settlement Agreement, employees may be required to tip-out or tip-pool with the club's other employees, but they must be paid minimum wage (or, where available, at the tip-credited wage). Employees will also be entitled to commissions of at least 20% of their dance fees that exceed the cost of employment, as well as 20% commissions of their sale of 'conversation beverages,' which are drinks that dancers persuade customers to buy for them. Employees will be reimbursed by the club for all license and permit fees required to perform at the club, and the club will provide them with two logo costumes per month to wear while working. In contrast, the Settlement Agreement prevents Déjà Vu from imposing any work schedule upon IPEs or requiring IPEs to tip-out or tip-pool with any employee. IPEs also cannot be required to wear any costume. Finally, IPEs will have the right to vote in each club's annual IPE meeting to change or modify any club policy that affects IPEs, which ensures that they have sufficient control over the clubs' operations to prevent Déjà Vu from exerting employer-employee control over IPEs.

With respect to monetary relief, the Settlement Agreement divides a total award of $6.55 million into three primary categories: $1 million toward the Net Cash Payment Settlement Fund

("the cash pool"), $4.5 million toward Secondary Pool Remuneration ("the secondary pool"), and $900,000 in attorneys' fees.[2]

The first two categories serve as alternative forms of monetary relief for the class members. The first option is to receive a one-time payment from the cash pool. The $1 million cash pool includes $30,000 in Enhancement Payments for the named plaintiffs and $50,000 to pay defendants' Administration Costs. After subtracting these costs, the total cash pool to be split between all of the Dancers who elect to receive a one-time direct payment is $920,000. Cash pool funds will be allocated on a point-based system that favors dancers who worked for the clubs for a longer period of time, as well as dancers who worked more recently at Déjà Vu's clubs.

The second option is to collect settlement funds from the secondary pool in the form of credits that can be used at Déjà Vu clubs. This is the default form of relief for Dancers who do not opt into the cash pool: each time a class member performs at one of Déjà Vu's clubs, credits from the secondary pool will either cover 60% of her daily rent at the club or allow her to collect up to $100 in dance fees. Depending on how many months the dancer has performed at the Déjà Vu club where she collects the credits, the total amount of money she can recuperate from the secondary pool is capped at $200, $1,000, or $2,000.

Finally, the Settlement Agreement provides compensation for the Dancers' attorneys. Under the Settlement Agreement, Déjà Vu agrees not to oppose an award of up to $900,000 in direct attorneys' fees. Déjà Vu also agrees not to oppose an award of up to $300,000 in indirect attorneys' fees to be paid out of the Dancers' secondary pool. The Settlement Agreement establishes that the indirect fees are to be calculated based on 33.3% of the value of the redeemed portion of the secondary pool. These indirect fees are designed to encourage the Dancers' counsel to try and shore up as much participation as possible in the secondary pool by creating a "*direct financial incentive*" for their work. (Déjà Vu Br. 64 (italics in original).)

---

[2]The Settlement Agreement also allocates $100,000 to resolve all Private Attorneys General Act claims against its clubs in California.

On June 19, 2017, the district court approved the Settlement Agreement. In finding that the parties satisfied their burden to show that the Settlement Agreement was fair, the district court turned to *International Union, UAW, et al. v. General Motors Corp.,* 497 F.3d 615, 631 (6th Cir. 2007) ("*UAW*"), which established a set of factors to determine the fairness of class action settlements. In particular, the court stressed the first factor—the comparison between the relief offered in the Settlement Agreement and the Dancers' likelihood of success on the merits against Déjà Vu. The court emphasized the "high risk of continued litigation and the uncertain likelihood of success on the merits" for the Dancers, finding that without the Settlement Agreement, "the vast majority of class members would recover nothing." (Op. & Order, R. 77, PageID 4212, 4221.) The court also found that the Settlement Agreement "offers value to the class in the form of cash, rent-credit or dance-fee payments, and long-term structural changes to Defendants' business practices, all of which directly benefit class members." (*Id.* at PageID 4212.) After analyzing the remaining *UAW* factors, the court concluded that the Settlement Agreement "is the result of a bona-fide dispute, and the terms established in the settlement are a fair, reasonable, and adequate resolution of the claims." (*Id.* at PageID 4216.)

Four members of the class—Eva Cabrera, Brittney Halverson, B.D., and C.T. (collectively, "the Objectors")—objected to the settlement. The district court overruled their objections, and they now appeal the approval of the Settlement Agreement. The Objectors' arguments fall into two broad categories. First, the Objectors argue that the district court abused its discretion by failing to properly apply the factors that ensure the fairness of settlement agreements, especially with respect to the district court's attempt to calculate the value of the Dancers' claims. Second, the Objectors argue that the settlement violates the procedural requirements of Federal Rule of Civil Procedure 23, given the breadth of the class release and the notice afforded to the unnamed class members.

## II.

We review a district court's approval of a class action settlement for abuse of discretion. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 717 (6th Cir. 2013).

**A.  *UAW* Fairness Factors**

In *UAW*, we established a seven-factor test to assess whether or not a class action settlement is "fair, reasonable, and adequate" under Federal Rule of Civil Procedure 23(e). 497 F.3d at 631.  Those factors include:  (1) the "risk of fraud or collusion," (2) the "complexity, expense and likely duration of the litigation," (3) the "amount of discovery engaged in by the parties," (4) the "likelihood of success on the merits," (5) the "opinions of class counsel and class representatives," (6) the "reaction of absent class members," and (7) the "public interest."  *Id.*

Of the *UAW* factors, "[t]he most important of the factors to be considered in reviewing a settlement is the probability of success on the merits."  *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 245 (6th Cir. 2011).  Thus, we address the most important factor first before proceeding to the remaining factors.

1.  *Likelihood of Success on the Merits*

A court "cannot judge the fairness of a proposed compromise without weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement."  *UAW*, 497 F.3d at 631 (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 (1981)).  For this reason, all class action settlements involve a balancing of competing interests. When extinguishing the claims of a large class of people—some of whom may not even be aware that a pending lawsuit affects their rights—courts are required to closely analyze whether the claims that the unnamed class members are giving up are worth the benefits they may receive.  Balancing those interests is difficult in cases involving industries rife with turnover, fear of retaliation, and unequal bargaining interests between the class and the defendants.  The district court appropriately gave a great deal of consideration to this factor.

After evaluating a damages model based on records from Jane Doe 1 and one other class member, as well as the high risks inherent in litigation and the potential impact of the mandatory arbitration clause on the Dancers' claims, the district court found that the direct benefits provided by the Settlement Agreement outweighed the value of the Dancers' claims.  We affirm, as the district court did not abuse its discretion in valuing the Dancers' claims or the Settlement Agreement.

i.     *Value of the Dancers' Claims*

The Objectors' primary claim is that the district court abused its discretion by improperly calculating the value of the FLSA and state wage-and-hour claims that the Dancers were relinquishing in the Settlement Agreement. As a result of limited discovery and the absence of a class-wide damages model, the Objectors contend that the Settlement Agreement undercompensates the class. By estimating the number of dancers working at a club per shift, the length of their shifts, and multiplying it by the federal minimum wage, the Objectors estimate that if the class action proceeded to trial, with 64 clubs, the plaintiffs could receive up to $141 million dollars.[3] Alternatively, the Objectors point to other dancer disputes as a basis for comparison, identifying over a dozen jury trials and settlements that provide dancers with higher awards than the Settlement Agreement. Thus, the Objectors argue that the Settlement Agreement's cash pool pales in comparison to the damages that the Dancers could receive if they went to trial, and the Settlement Agreement is inadequate to justify releasing the Dancers' claims against Déjà Vu.

In evaluating settlements, courts are not required "to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). That sentiment is reinforced here, where Déjà Vu and the Dancers argue that complete, accurate class-wide models can be "impossible to construct in exotic dancer cases," because "clubs do not maintain adequate records or payroll data needed to prepare common FLSA damage modeling." (Jane Doe 1 Br. 32–33.)

But that is not to say that the court can avoid carefully scrutinizing litigation risks in complex class actions. We have found that it can be an abuse of discretion for a district court to "merely recite the respective arguments of the objectors and parties, and then offer up platitudes about the risks of litigation generally." *Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 309 (6th Cir. 2016). "Instead, the district court must specifically examine what

---

[3]This estimate is undercut by the fact that the Objectors argued at the fairness hearing below that the Dancers could receive only $70 million at trial.

the unnamed class members would give up in the proposed settlement, and then explain why—given their likelihood of success on the merits—the tradeoff embodied in the settlement is fair to unnamed members of the class." *Id.*

Here, the district court did not abuse its discretion in determining that the benefits of the Settlement Agreement outweigh the value of the Dancers' claims. The district court specifically examined what the class members were giving up based upon the available records used to calculate the damages model. The damages model showed the awards that a dancer could receive based on full or reduced minimum wage, as well as with or without offsetting the fees that dancers received during their time at Déjà Vu. By accounting for each of these factors and presenting the district court with an array of awards potentially available to the Dancers, the model offered some insight into the variation in recovery under different states' laws. Thus, although the court acknowledged that the damages model was imperfect based on the lack of records for many class members, it still found that the model was "useful to determine class members' range of possible recovery." (Op. & Order, R. 77, PageID 4206.) Additionally, in light of the precedent directing courts to look to the risks faced by the parties at hand rather than the general risks of litigation, the district court did not abuse its discretion in finding that the model was more helpful than the Objectors' comparisons to sums awarded in other class actions—as the court found, "[t]he key question is not Plaintiffs' likelihood of success against the defendants in the cases cited by the objectors[,] but their likelihood of success against Defendants here." (*Id.* at PageID 4210.)

Moreover, the court did not rely solely on the damages model in assessing the value of the Dancers' claims. Before approving the settlement, the district court also considered possible counterclaims against the Dancers, the potential of an unfavorable verdict finding that the Dancers should be classified as independent contractors, and the risk that the Dancers would have to face mandatory and binding arbitration in compliance with the arbitration clauses in their performance leases. (*Id.*)

The high risk of arbitration in this case was recently confirmed by the Supreme Court's opinion in *Epic Systems v. Lewis*, 138 S. Ct. 1612 (2018), which transformed the lay of the land for FLSA actions. Before *Epic Systems*, FLSA plaintiffs had successfully blocked the

enforcement of arbitration clauses in employment contracts under the Federal Arbitration Act's "saving clause" by arguing that individual arbitration clauses in employment contracts violated federal law protecting employees' ability to engage in class or collective actions. *Id.* at 1620. *Epic Systems* foreclosed that argument. *Id.* at 1623, 1626, 1632. In reliance upon *Epic Systems*, we have since held that the FLSA's collective action guarantees do "not displace the Arbitration Act's requirement that we enforce the employees' agreements as written." *Gaffers v. Kelly Servs.*, 900 F.3d 293, 296 (6th Cir. 2018); *see also McGrew v. VCG Holding Corp.*, 735 F. App'x 210, 211 (6th Cir. 2018) (finding that "individual arbitration agreements are enforceable against both employees and independent contractors" in case involving exotic dancers). These rulings highlight the uphill battle the Dancers would face in attempting to litigate their claims.

If the arbitration clauses in the Dancers' performance leases are enforced, proceeding with arbitration poses significant risks to many of the Dancers. One major concern is that the Dancers' performance leases contain arbitration provisions requiring the losing party to pay the prevailing party's attorneys' fees. The Objectors also concede that a substantial number of the Dancers fear retaliation for bringing a claim against the clubs. In sum, the district court did not abuse its discretion in finding that many of the Dancers would receive little, if any, relief in lieu of the Settlement Agreement. *See In re Dry Max Pampers Litig.*, 724 F.3d at 723 ("The conventional argument for class action lawsuits is that the majority of class members' claims would not otherwise be worth bringing.").

### ii.     *Value of the Settlement Agreement*

The district court also did not abuse its discretion in evaluating the benefits provided by the Settlement Agreement's injunctive and monetary relief. We reject the Objectors' contention that the credits available through the secondary pool function as coupons that cannot be counted toward the total value of the Settlement Agreement under the Class Action Fairness Act. *See* 28 U.S.C. § 1712. The Objectors' main support for that proposition, *In re Easysaver Rewards Litig.*, 906 F.3d 747 (9th Cir. 2018), is readily distinguishable. In contrast with coupon settlements that require an individual to buy a product or service before receiving the promised benefits, *id.* at 755, the secondary pool does not require class members to "hand over more of their own money" to be eligible to redeem the benefits of the Settlement Agreement in this case;

here, the cash pool offers an alternative form of relief to dancers who prefer to cut ties with Déjà Vu. Because the Dancers can choose to receive compensation from the cash pool regardless of whether they continued working at Déjà Vu, the Settlement Agreement cannot be understood to require the Dancers to "reengag[e] in the same . . . activity that they believe led to their injury." *Id.* at 757.

When compared against the risks involved in litigating or arbitrating the Dancers' claims, the value of the Settlement Agreement is significant. The injunctive relief mandates extensive changes to Déjà Vu's business practices, and both the $1 million cash pool and the $4.5 million secondary pool are available to provide financial compensation to the Dancers in the form that best suits each individual dancer's circumstances. We find that the district court did not abuse its discretion in finding that the tangible benefits afforded to class members as a result of the Settlement Agreement outweigh the value of the volatile claims that the Dancers released.

### 2. *Remaining* UAW *Factors*

*UAW* also instructs courts to consider the risk of fraud or collusion. *UAW*, 497 F.3d at 631. The Objectors argue that the Settlement Agreement promotes collusion between the Dancers' counsel and Déjà Vu's counsel. Specifically, the Objectors take issue with the Settlement Agreement's "clear-sailing clause," which provides that Déjà Vu "agree[s] not to object to a request" for up to $900,000 of direct attorneys' fees and up to $300,000 of indirect attorneys' fees. (Settlement Agreement, R. 41-2, PageID 1173.) The Objectors argue that the "attorneys' fees sought by Class Counsel . . . dwarf[] the recovery of the Class." (C.T. Br. 29.) The district court correctly rejected this argument. "Not every 'clear sailing provision' demonstrates collusion." *Gooch v. Life Inv'rs Ins. Co. of Am.,* 672 F.3d 402, 426 (6th Cir. 2012). Additionally, the fee award is not disproportionate to the recovery of the class. On one hand, assuming that the Dancers fully deplete the secondary pool and class counsel receive the full amount of indirect fees, the attorneys' fees would represent only 23% of the total settlement award, even without including the value of injunctive relief. On the other hand, assuming that not a single dancer opts into the secondary pool, the $900,000 in attorneys' fees would represent only 20% of the combined value of the cash pool and the district court's approximation of the value of the injunctive relief. It is not abnormal for negotiated attorneys' fee awards to comprise

20% to 30% of the total award. *See Waters v. Intern. Precious Metal Corp.*, 190 F.3d 1291, 1294 (11th Cir. 1999); *Gooch*, 672 F.3d at 426. Accordingly, the district court did not abuse its discretion in finding that this factor weighs in favor of approval.

Another *UAW* factor is the complexity, expense, and likely duration of the litigation. 497 F.3d at 631. The district court noted that "[t]his case presents complex legal issues because it combines a Rule 23 class action with a FLSA collective action." (Op. & Order, R. 77, PageID 4214.) Indeed, the *Cin-Lan* settlement illustrates the complexity of an FLSA class action claim involving exotic dancers. There, plaintiffs litigated against defendants for three years and engaged in extensive discovery and motion practice before entering into a final settlement agreement. In contrast, the Settlement Agreement in this case conserves judicial resources by consolidating eight other lawsuits and administrative proceedings into the present Settlement Agreement. The district court did not abuse its discretion in finding that this factor cuts in favor of approving the Settlement Agreement.

The next *UAW* factor is the amount of discovery engaged in by the parties as a factor in approving settlements. 497 F.3d at 631. The Objectors argue that the district court abused its discretion by approving the settlement without requiring the parties to engage in discovery, which led to class counsel undervaluing the class's claims and creating a financial windfall for class counsel. But courts have held that settlements are permissible where, "notwithstanding the status of discovery, plaintiffs' negotiators had access to a plethora of information regarding the facts of their case." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981). The *Cin-Lan* case, which involved extensive discovery, provided the Dancers' counsel with a vehicle to obtain the necessary information. This case involves the same counsel litigating similar claims on behalf of many of the same dancers against one of the same defendants. As the district court found, the parties in this case "made a sufficient showing of informal discovery based on their efforts in *Cin-Lan*, when [the same class counsel] served 13 interrogatories and 87 requests for production on each of the three [D]efendants, took 13 depositions of Defendants' officers and managers, and filed numerous subpoenas on third parties." (Op. & Order, R. 77, PageID 4214.) Because of the substantial overlap between the

two cases, the district court did not abuse its discretion in finding that the parties' informal discovery from *Cin-Lan* was sufficient.

Two *UAW* factors focus on the class's response to the proposed settlement: courts are required to consider the opinions of class counsel and class representatives, as well as the reactions of absent class members. 497 F.3d at 631. Jane Doe 1, the named representative, is not among the Objectors in this case—she has a favorable view of the settlement. And both Déjà Vu and the Dancers agreed that the counsel representing both parties had extensive experience, which supports the district court's finding that counsels' positive outlook toward the fairness of the settlement weighed in favor of approving the Settlement Agreement. The settlement agreement has also received a relatively positive response from absent class members. The class consists of 28,177 current and former dancers. Of those, 24,575 notices were delivered, which amounts to nearly 88% of the class. And of the dancers that received notices, by the time the court held its fairness hearing, 19% of the class—or 4,623 dancers—opted-in to the settlement, which exceeded the parties' expected 15% opt-in rate. In contrast, only 66 dancers opted-out of the settlement, or 0.2%, and there were only six objectors to the settlement, or 0.02%. The Objectors' only challenge to these two factors is their contention that the district court afforded too much deference to counsel. But the court expressly acknowledged that counsel's opinions were "by no means dispositive." (Op. & Order, R. 77, PageID 4215.) Thus, the district court did not abuse its discretion in finding that the level of support and participation from the class supported approval of the Settlement Agreement.

The final *UAW* factor is the public interest. 497 F.3d at 631. Courts have held that "there is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003). At the same time, courts have also found that the enforcing the FLSA furthers an important interest in "encouraging employees and others to ensure that employers comply with laws governing employment." *Levan v. Sears, Roebuck & Co.*, 984 F. Supp. 2d 855, 871 (E.D. Tenn. 2013). The district court concluded that this Settlement Agreement achieves both purposes: the settlement "puts an end to 'potentially long and protracted litigation,'" and it also "mandates

long-term structural changes to Defendants' business practices designed to ensure workers are accurately classified and employees receive appropriate wages and legal protections." (Op. & Order, R. 77, PageID 4216.) We agree. Therefore, the district court did not abuse its discretion in finding that this factor weighed in favor of approving the Settlement Agreement as well.

## B. Rule 23 Procedural Requirements

The Objectors also argue that the settlement violates the procedural requirements of Federal Rule of Civil Procedure 23, because the class release is impermissibly broad and the class notice failed to adequately apprise the class members of their rights. We address each argument in turn.

### 1. Breadth of Class Release

The Settlement Agreement defines the "Settlement Class Members' Released Claims" as "all Claims asserted in the Action, or to be asserted in the Action by way of the amendment contemplated in this Agreement, and any and all Claims of any conceivable kind or nature whatsoever that are based on such pleadings or that are reasonably related thereto (except only for those under the FLSA)." (Settlement Agreement, R. 41-2, PageID 1160.) The Settlement Agreement goes on to list ten categories of state law claims it specifically includes within this definition, including employment, wage, and labor claims against Déjà Vu. The Objectors claim that a class release of this breadth cannot satisfy the "identical factual predicate doctrine" outlined by the Second Circuit in *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, which limits class releases to "claims that share the same integral facts as settled claims, provided that the released claims are adequately represented prior to settlement." 396 F.3d 96, 106 (2d Cir. 2005). As with the remainder of the district court's approval of the Settlement Agreement, we review the district court's determination on this issue for abuse of discretion. *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 349 (6th Cir. 2009).

This court has held that "the question is not whether the definition of the claim in the complaint and the definition of the claim in the release overlap perfectly; it is whether the released claims share a 'factual predicate' with the claims pled in the complaint." *Moulton*,

581 F.3d at 349 (internal citations omitted).  The claims released in the Settlement Agreement share that factual predicate, as the release specifically cabins the categories of relinquished claims to those "based upon" or "reasonably related" to the pleadings and claims asserted in the Settlement Agreement.  Therefore, the Objectors' argument that the release covers claims "completely ***unrelated*** to the lawsuit" lacks merit.  (Cabrera Br. 54 (emphasis in original).)

### 2.  *Adequacy of Notice to Class Members*

Finally, the Objectors claim that the class notice was inadequate to apprise the class members of their rights.  Rule 23(c)(2)(b) requires the class to provide notice of the nature of the action; the definition of the class certified; the class claims, issues, or defenses; information on how a class member can enter an appearance with their lawyer; information on how class members can opt into or out of the settlement; and the binding effect of the settlement agreement.  Additionally, we have held that "due process requires that notice to the class be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 759 (6th Cir. 2013).  We review the adequacy of class notice de novo.  *Fidel v. Farley*, 534 F.3d 508, 513 (6th Cir. 2008).

The notice that the Dancers provided to the class covered all of the bases set out in Rule 23(c)(2)(b).  Still, the Objectors advance several arguments for why the notice failed to comport with the due process requirements outlined above.

First, the Objectors contend that the notice mischaracterized the scope of the release. This argument fails.  The notice stated that, by staying in the class, a dancer would "give up [the] right to sue Deja Vu . . . on any state law claims later," and that all class members "will have released all Defendants, including all of the Deja Vu–Affiliated Nightclubs, from any further claims related to the matters raised in this lawsuit" such that class members  "cannot ever sue any of the Defendants about these issues based upon conduct that occurred prior to the Effective Date of the settlement."  (Notice of Settlement, R. 37-1, PageID 1036, 1041–42.)  The class notice accurately captured the scope of the release.  *See supra* at 14.

Second, the Objectors argue that the notice provided was unclear with respect to how the settlement would be split among the Dancers.  But the Objectors cite no authority that requires a notice to state how much money each class member would receive, nor do they explain how the notice could have accurately stated the amount each dancer was eligible to receive from the cash pool before knowing the total number of dancers who opted to participate in the cash pool.  The notice appropriately details the two forms of monetary relief, including the total cash pool amount and the structure and value of the secondary pool credits, which is reasonable under the circumstances.

Third, the Objectors claim that the notice was deficient because it failed to list "the 10 prior-filed class and collective actions against some of these clubs in which class members could have pursued their claims as an alternative to joining this action." (Cabrera Br. 55.)  For support, the Objectors point to *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004), a case in which the Objectors claim that the Seventh Circuit reversed the approval of a settlement because of a failure to inform class members of a pending state case.  But the Objectors oversell the holding in *Mirfasihi*, which was rooted in the fact that many class members could have recovered in the pending cases but were entitled to *absolutely no recovery* in the action in question.  *See id.* at 785.  The Seventh Circuit expressly stated that, in other contexts, notice of pending suits is not a "requirement[] of an acceptable settlement."  *Id.*  Here, where the Settlement Agreement provides some monetary relief to every class member and compels Déjà Vu to change its business practices through injunctive relief, failure to provide notice of other pending suits does not render the class notice unreasonable.  For those reasons, the notice comports with the requirements of due process.

**III.**

We affirm the judgment of the district court.

—————————————

**OPINION**

—————————————

HELENE N. WHITE, Circuit Judge, dissenting in part.

I agree with the majority except with regard to the coupon and attorney fee issues. Because I conclude that the secondary-pool credits are coupons under the Class Action Fairness Act (CAFA), I dissent from the majority's approval of the attorney fee provision of the settlement agreement, and would remand to the district court for reconsideration of the fee award consistent with CAFA.

CAFA regulates attorneys' fee awards for class-action settlements that provide relief to class members in the form of coupons. 28 U.S.C. § 1712. Coupon settlements deserve additional judicial scrutiny because of the myriad problems they present: coupon-redemption rates are often low, so coupon settlements do not provide meaningful compensation to many class members; coupon settlements may not disgorge ill-gotten gains from defendants because a defendant suffers no loss from unredeemed coupons; and coupon settlements may require class members to continue engaging in business with the defendant in order to obtain relief. *See* Christopher R. Leslie, *The Need to Study Coupon Settlements in Class Action Litigation*, 18 Geo. J. Legal Ethics 1395, 1396–97 (2005). To mitigate the risk of class counsel inflating settlement valuations—and thus attorney fees—with illusory coupon relief, CAFA provides:

> If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.

28 U.S.C. § 1712(a). By mandating that fee awards be calculated based on the value of redeemed coupons, CAFA "ensures that class counsel benefit only from coupons that provide actual relief to the class, lessening the incentive to seek an award of coupons that class members have little interest in using." *In re Easysaver Rewards Litig.*, 906 F.3d 747, 755 (9th Cir. 2018) (citation omitted).

CAFA does not define "coupon," however.  As a result, courts have sought to give meaning to the term, "informed by § 1712's animating purpose of preventing settlements that award excessive fees while leaving class members with 'nothing more than promotional coupons to purchase more products from the defendants.'"  *In re Easysaver*, 906 F.3d at 755 (quoting *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 950 (9th Cir. 2015)).  This court has not addressed § 1712 or the definition of "coupon" at length, but the Ninth Circuit has enumerated three factors that distinguish coupon settlements from non-coupon settlements: "(1) whether class members have to hand over more of their own money before they can take advantage of a credit, (2) whether the credit is valid only for select products or services, and (3) how much flexibility the credit provides, including whether it expires or is freely transferrable." *Id.* (citation and internal quotation marks omitted).  Other courts have considered similar criteria in evaluating whether a settlement provides for coupon relief.[1]  These cases provide guidance and support that the rent-credit and dance-fee payments in this settlement are coupons.

First, by requiring a class member to work at a Déjà Vu club to receive any benefit from the secondary pool, the settlement forces class members to continue doing business with Defendants.  For clubs that charge rent to the dancers they employ, the secondary pool gives a class member a 60% discount on her nightly rent, but the class member remits the remaining 40% to Defendants.  For all other clubs, a dance-fee credit provides, in effect, a $100 reduction in the dance fees collected by the club for that day.  In either case, a class member has to spend time that she could devote to other endeavors—and in essence, "hand over more of [her] own money" to Defendants—to take advantage of the settlement.  *In re Easysaver*, 906 F.3d at 757 (citation omitted).  *See also In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 706 (7th Cir. 2015) ("The potential for abuse is greatest when the coupons have value only if a class member is

---

[1]*See Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) (describing pre-paid envelopes as "a form of in-kind compensation that shares some characteristics of coupons, including forced future business with the defendant and . . . the likelihood that the full amount of [Defendant's] gains will not be disgorged"); *Reibstein v. Rite Aid Corp.*, 761 F.Supp.2d 241, 255–56 (E.D. Pa. 2011) (concluding that gift cards are not coupons because they "have actual cash value," "have no expiration date, are freely transferrable, and can be used for literally thousands of products for which ordinary consumers, including class members, have need"); *Radosti v. Envision EMI, LLC*, 717 F.Supp.2d 37, 54 n.16 (D.D.C. 2010) ("Although Congress did not define the term 'coupon' in the statute, courts have generally considered a coupon settlement to be one that provides benefits to class members in the form of a discount towards the future purchase of a product or service offered by the defendant.").

willing to do business again with the defendant who has injured her in some way"). And, credits may be redeemed only by a class member at the club where she works, so the secondary pool is of no value to former dancers unless they return to work.

Second, the credits are only available for specific "products or services." That is, depending on the business model of the Déjà Vu club in which she works, a class member may redeem a secondary-pool credit only for dance fees or for a 60% credit to her rent. The secondary-pool credits are therefore similar to the types of coupon settlements criticized in the Senate Judiciary Committee's Report: a "$1 off every subsequent $5 purchase," "a 30 percent discount on selected products," or $55 to use toward a purchase of a new crib from a crib producer accused of making defective cribs. S. Rep. No. 109–14, at 15–17 (2005).

Third, the settlement agreement imposes severe restrictions on the redemption of the secondary-pool credits. The credit pool is only available for a year, and the unclaimed funds in the secondary pool revert to Defendants at the end of the year. *See In re Easysaver*, 906 F.3d at 757 (credits that "expire one year after issuance" and "cannot be used in anywhere near the same way as cash" are coupons). The class member must notify the club seven days in advance that she wishes to redeem a rent credit or dance-fee payment; clubs are not required to permit more than five class members per day to redeem credits; and class members are selected on a first-come, first-served basis. A class member is limited to a maximum of $100 per day through the secondary pool. The settlement also establishes limits on possible recovery based on the length of time a class member has worked: a class member who has worked for one month may receive a maximum of $200.00 from the pool; for between six and eighteen months, a maximum of $1,000; for more than eighteen months, a maximum of $2,000. In short, the secondary-pool credits are much less flexible than the gift cards and vouchers found to fall outside CAFA's reach. *See In re Online DVD*, 779 F.3d at 951 (collecting cases).

Finally, the parties have not supplied any information suggesting a likely redemption rate for the secondary-pool credits, and it seems probable that at least some of the secondary-pool credits will go unredeemed. Thus, there exists a "likelihood that the full amount of [Defendant's] gains will not be disgorged." *Synfuel Techs.*, 463 F.3d at 654. Accordingly, I conclude that the

secondary-pool credits are coupons for the purposes of CAFA, and the settlement is subject to § 1712's attorney-fee requirements.

When a class-action settlement provides for coupon relief, either in whole or in part, CAFA requires that any attorneys' fee award "that is attributable to the award of coupons" be calculated using the value to the class of the coupons redeemed. 28 U.S.C. § 1712(a). In this case, the district court approved the fee award established in the settlement agreement based on a $6.55 million estimated total settlement value, $4.5 million of which represents the face value of the rent-credit and dance-fee payments available through the secondary pool. In a "mixed" settlement such as this, which "provides for an award of coupons to class members and also provides for equitable relief, including injunctive relief," CAFA mandates that the attorney fee related to the coupon relief be based on the value of the coupons actually redeemed, and the part of the attorney fee not based on the coupon recovery be based on the "amount of time class counsel reasonably expended working on the action." 28 U.S.C. § 1712(a)–(c). As the Ninth Circuit explained:

> The practical effect of § 1712(c) is that the district court must perform two separate calculations to fully compensate class counsel. First, under subsection (a), the court must determine a reasonable contingency fee based on the actual redemption value of the coupons awarded. Second, under subsection (b), the court must determine a reasonable lodestar amount to compensate class counsel for any non-coupon relief obtained.

*In re HP Inkjet Printer Litig*., 716 F.3d 1173, 1184–85 (9th Cir. 2013).

In this case, the district court erred by failing to calculate the redemption value of the coupons prior to approving the attorney fee award. The proposed settlement agreement provides that Defendants agreed to pay $900,000 in direct attorney fees and, contingent on payments taken from the secondary fund, up to $300,000 in indirect attorney fees. The district court found that because the overall settlement "creates a common fund worth at least $6.55 million," the $1.2 million attorney award was reasonable. (R. 77, PID 4217–18.) In evaluating the value of this common fund, however, the district court accepted at face value the secondary pool, finding that "the parties have made a sufficient showing that the secondary pool of rent-credit and dance-fee payments will give actual value to the class." (R. 77, PID 4218.) Setting aside the fact that

the parties made no such showing,[42] the district court's conclusion was contrary to CAFA, which plainly states that the fee award for a coupon settlement "shall be based on the value to class members of the coupons that are redeemed." 28 U.S.C. § 1712(a). As the Seventh Circuit has noted, § 1712(a) protects against abusive settlements by requiring that "any percentage-of-recovery award in a coupon settlement be based upon a percentage of the value of the coupons actually redeemed by class members, not the nominal value of the coupons merely available to the class." *In re Sw. Airlines*, 799 F.3d at 708.[53]

Nor is the fee award saved by the fact that the district court cross-checked the fee against the lodestar, because the district court's ultimate calculation assumed the $6.55 million total settlement value. The district court reviewed the attorneys' billings, subtracted unsupported fee submissions, and  calculated a total of $843,389.03 in fees for 1555.63 hours. The district court then found that "[t]he lodestar multiplier of 1.4, and the blended hourly rate of $542 are reasonable given the complexity of the case, the results achieved, and considering that Plaintiffs' counsel will continue to accumulate fees while they represent the class during the administration of the settlement." (R. 77, PID 4220.) In so reasoning, the district court "reverse-engineered" a multiplier to match the lodestar fee with the fee established in the settlement agreement. *In re Easysaver*, 906 F.3d at 759. As in *In re Easysaver*, the lodestar figure "lost [its] independence when the district court used a multiplier to match the lodestar fee to the percentage-of-recovery fee—which was, by definition, a percentage of the full value of the settlement, including the face value of the coupons." *Id*. The value of the secondary-pool coupons thus impermissibly informed the district court's calculation of the lodestar.

---

[2]The record and the briefing in this case make clear that there is no readily available information regarding likely redemption rates. The settlement agreement in *Cin-Lan* contained a similar secondary credit pool, but the defendants and plaintiffs' counsel failed to collect information regarding the actual redemption of those credits (despite the settlement agreement specifically requiring them to do so). As a result, the parties here do not have the results of that process to inform the fee award in this case. As class counsel stated at the fairness hearing, "We don't know . . . how many people are going to use the rent credits once they make that election." (R. 105, PID 4511.)

[3]I recognize that the attorneys' fee award does not award counsel a full one-third of the face settlement amount of $6.4 million. Instead, counsel receives close to half of the cash settlement and is capped at 6.6% of the secondary pool. I also recognize that the settlement provides for injunctive relief that the district court found provided value to the class. But without determining the real value of the secondary pool, it is impossible to "ensure[] that class counsel benefit only from coupons that provide actual relief to the class." *In re Easysaver*, 906 F.3d at 755. Stated differently, one may ask whether the $900,000 cash fee award would be appropriate if only 10% of the secondary pool is actually redeemed.

Finally, the majority states that even if the secondary pool is considered worthless, the injunctive relief provided through the settlement increases the overall value to the class by approximately $3.4 million, and therefore the $900,000 cash fee award would not be unreasonable.  The injunctive relief may ultimately support the award, but the existing record provides insufficient support for the $3.4 million valuation.  Although the district court accepted as "unrebutted" Defendants' $3.4 million estimate, the record indicates that Objectors raised significant concerns about the reliability of the underlying data and whether any change in Defendants' clubs' procedures was actually achieved through the settlement.  Specifically, Objectors asserted that Defendants' projections overestimated the number of current dancers who would choose to become employees, thereby inflating the value of the injunctive relief.  The district court did not address either objection, presumably because it found that the secondary pool sufficiently supported the fee award.  And a close look at Defendants' value calculations reveals potentially dubious assumptions.  For example, Defendants' calculations assume that dancers who take advantage of the injunctive relief and convert to employee status would earn $173 more per shift than dancers who continue to work as independent contractors.  This increase in pay is based on the questionable proposition that an employee dancer would generate *double* the dance revenue that an independent contractor would.  Defendants' report provided no data to support this proposition.

But even accepting the Defendants' estimate of the value of the injunctive relief, the district court clearly found that the secondary pool provided at least some benefit to the class, and evaluated the fee award on that basis.  As explained above, CAFA requires the district court to base its determination on the actual value of the coupons redeemed, not on speculation.

For these reasons, I would vacate the approval of the attorneys' fee award and remand for recalculation of the fee award consistent with CAFA.